25a 631
27a  43

## No. 5945.

### W. E. TRUMBLE *v.* THE STATE.

1. MURDER—SELF DEFENSE—CHARGE OF THE COURT.—See the statement
of the case for evidence *held* not to raise the issues either of murder of
the second degree, manslaughter or self defense, and therefore not to
have demanded of the trial court instructions upon such issues. Note
also that it is sufficient to support a conviction for murder of the first
degree.

2. SAME—EVIDENCE—THREATS.—The defense having proved the threats of
the deceased to take the life of the defendant, the State was permitted
to prove, as testimony to show the abandonment of such design by the
deceased, that, at the time of the homicide he was preparing to remove
from the neighborhood in which he and the defendant lived.  *Held* that,
under the circumstances of the case, the admission of such proof was
not material error, if erroneous in any degree or aspect.

APPEAL from the District Court of Jones.    Tried below be-
fore the Hon. J. V. Cockrell.

The conviction in this case was in the first degree for the mur-
der of J. L. Abbott, and the penalty assessed against the appel-
lant was a life term in the penitentiary.

A. W. Abbott, the brother of the deceased, was the first wit-
ness for the State.    He testified that, for three years prior to
August 16, 1886, he lived with his brother, the deceased, in the
village of Otta, in Cottle county, Texas.    Witness's brother,
Bart, and one F. E. McGauhey also lived at the deceased's house
at that time. · Deceased was murdered by the defendant in Cot-
tle county, Texas, on the evening of August 16, 1886.    About
mid afternoon on that day the witness went to the spring, about
two hundred yards distant from the deceased's house, to get a
bucket of water.    On his way back he met the deceased, with
his year old baby in his arms, and a bucket in his hand, going
toward the spring.    Witness handed the deceased his bucket of
water and took the empty bucket and started back to the spring,
and the deceased started back to the house.    The child, however,
by motioning and crying, manifested its wish to go to the
spring, when witness and deceased again exchanged buckets,
and witness went on to the house, and deceased, with his child,
went on to the spring.    On reaching the house and putting

down his bucket of water, the witness mounted a chair which stood in the front door way and looked towards the spring and towards Pruitt's house, which stood about two hundred yards from the spring. Witness could see the Pruitt house from the chair, but could not see the spring, nor could he see a man standing at the spring. The said spring was in the bed of the Wichita river. While looking from his chair the witness saw the defendant at a point about half way between the spring and Pruitt's house, going in the direction of the said house. Defendant then had no gun in his hands. Witness watched the defendant until he entered Pruitt's east gate and passed around the house as if to reach the south door, which the witness could not see from his position. Presently the defendant emerged from Pruitt's house with a gun in his hands, passed out the gate and went towards the spring, where the deceased was. Witness immediately jumped off the chair, seized his gun, and ran to the brow of the hill which commanded an imperfect view of the spring. When he reached that point witness saw the deceased stooping at the spring as if to fill a bucket of water, and the defendant standing at a point about twenty-five steps distant from the deceased, with his gun in a shooting position, and pointed at the deceased. Defendant fired towards deceased, when deceased stood up with his back towards witness, and then fell backwards. Witness then fired at the defendant, and defendant again fired at the deceased. Deceased then struggled to his feet and ran towards the river. Defendant fired several other shots at the deceased, and deceased finally fell at the water's edge, his feet in the water and his face to the ground. Witness fired several shots at the defendant, and the defendant fired several shots at him. Witness, having emptied the magazine of his gun of cartridges, went to his brother's house for more, and when he returned to the scene of the fight he found that defendant had gone to Pruitt's house and secured his horse. When witness reached the top of the hill the defendant said something to him which witness did not understand, more than that part of it was: "Go and take care of your brother." Defendant and Melvin Dewitt then galloped off together on their horses. The witness then went to the deceased and found him in a dying condition, unconscious, but not quite dead. He died a few minutes later. The bucket, about three-fourths full of water, was sitting on the ground, and the dipper was lying near it. Deceased's pipe, which he had in his mouth when witness met him

going to the spring, was picked up a few steps distant from the spring. The body lay near the channel of the river. The spring was a small one, enclosed in a tin box, and a dipper or cup had to be used to fill a bucket from it. Deceased was in his shirt sleeves, and had on an unbuttoned vest when shot and killed. He had neither a pistol nor a gun on his person. The spring was southeast from the house of the deceased, and northeast from Pruitt's. A man at the spring could not be seen from either of said houses. Mrs. Abbott, the widow of the deceased, reached the body a little in advance of the witness.

Cross examined, the witness said that he had never measured any of the distances mentioned by him, but thought that the spring was about two hundred yards from the deceased's house. and a few yards further from Pruitt's house. There was a small picket pen, about thirty feet square and from five to eight feet high, a short distance north of Pruitt's house. Witness did not see the defendant on the fatal day until he saw him going towards Pruitt's house from the direction of the spring. He then had no gun. He passed into Pruitt's yard at the east gate and wen; around the house as if to go in at the south door. He then wen: out at the east gate, with a gun in his hands, and went towards the spring. Witness then sprang from his chair, seized his gun and ran towards the spring. When he next saw defendant he was in the act of firing upon deceased. Witness fired at defendant as soon as he could after defendant fired his first shot at deceased. Witness denied that he ever, at any time or place, stated to any person that he was in his brother's house when defendant fired the first shot, and that when he saw his brother fall he was at the house.

F. E. McGauhey testified, for the State, that he was justice of the peace in Cottle county in August, 1886, and as such officer held the inquest upon the body of the deceased. Witness was living with deceased at the time he was killed, and had lived in his house since 1884. Deceased's said house was in the village of Otta, in said Cottle county. Witness saw deceased at about noon on the fatal day. He, witness, then went off to hunt horses for deceased, and did not see him again in life. He saw the body near the spring on that afternoon. It was lying in the bed of the Wichita river, the feet touching the edge of the water. There was no pistol on the body, nor had the deceased owned a pistol since the twentieth day of the preceding month. Witness left the body at the spring and went off to summon a jury of

inquest. Upon his return he found the body at the house, whither it had been removed. Witness did not examine the body, and could make no statement about the wounds on it. He, however, took measurements between the different points mentioned in the testimony of the witnesses, and could speak as to such distances. The distance from the deceased's house to the brow of the hill where A. W. Abbott testified that he stood at the time of the homicide was two hundred and four yards. The distance from where A. W. Abbott stood to where the defendant stood was one hundred and sixty-two yards. The distance from where the defendant stood to the spring was twenty-five yards. The distance from Pruitt's house to the spring, by the path, was one hundred and thirty-eight yards. A man in the channel of the river or at the spring could not be seen from Pruitt's house. The nearest point from and in the direction of Pruitt's house at which the spring could be seen was one hundred and two yards, which would place that point at a distance of thirty-six yards from the spring. In other words, a man going to the spring from Pruitt's house would have to approach within thirty-six yards of the spring before seeing it. The Wichita river runs east, and the deceased's house was north and Pruitt's house south of it. Pruitt's path struck the river west or above the spring. The view from Pruitt's house to the spring was so obstructed by a bank that a person going to the spring from Pruitt's house would have to reach the channel of the river before he could see the spring. From the brow of the hill where A. W. Abbott stood a man could be seen at the spring as far down as his hips, if standing, but only his head could be seen if he was stooping to get water. A person standing in a chair at deceased's house could easily see a man or a dog in Pruitt's yard. A person standing in a chair on deceased's gallery could see a man walking along the path from the spring to Pruitt's house, after such person had left the channel of the river.

Had the witness succeeded in finding the horses of the deceased in time, the deceased would have moved from Otta to Margaret, his avowed object being to get away from the neighborhood in which the defendant lived. Deceased, to the knowledge of witness, was making preparations to leave at the very time of his death. The witness knew as a fact that there was no pistol at the deceased's house at the time of the homicide, nor had there been one at that house since the fifteenth or twentieth day of the preceding March. The witness saw two diffi-

culties between the defendant and deceased prior to the death of the latter. Both of those difficulties occurred at the house of the deceased, and where the family of the deceased lived. Deceased had a little store in the front room of his house, in which the witness, who was a boot and shoe maker by trade, had a bench. The village or hamlet of Otta consisted only of the houses of deceased and Pruitt, their nearest neighbor being more than a mile distant. At the last of the difficulties between the deceased and defendant, mentioned by the witness as having been seen by him, which occurred about the twentieth of July preceding the homicide, some ineffectual shots were exchanged between deceased and defendant. Bart Abbott was in charge of the store on that day, and when defendant stepped into the store he ordered him, defendant, out. Defendant refused to go, when Bart Abbott called him a son of a bitch. Defendant thrust his hand into his bosom, but withdrew it without a pistol. He then seized a chair and struck at Bart Abbott over the counter. He finally put the chair down, drew his pistol, and, holding it in a position to shoot, whipped Bart Abbott with a quirt. About that time Mrs. Abbott's room door opened and deceased fired from that room at defendant with a gun but missed him. Defendant then fired several shots from his pistol into Mrs. Abbott's room, and then got on his horse and left. G. Bacchus, who was present, went off with defendant. Defendant cursed violently as he rode off, but witness did not remember what he said.

Cross examined, the witness said that the Pruitts got their water supply from the spring, and that it was used by cowboys in passing. The defendant, at the time of the difficulty at the house of the deceased in July, was owing the witness for a pair of boots. He did not say anything then about paying for them, but a few days before that he said something about a check he was expecting, out of which he would pay witness. After the difficulty in July the deceased said that if the defendant did not stay away from his place he would kill him.

Mrs. J. L. Abbott testified, for the State, that her husband, with their child near two years old, and a bucket and a dipper, left their house on the evening of August 16, 1886, to go to the spring to get a bucket of water. He had been gone but a short time when witness heard several reports of a gun or guns. She ran rapidly to the spring, and when she reached the brow of the hill she saw the defendant going towards the Pruitt house, with

his gun in his hands. Going on to the spring, the witness found her husband lying on the ground, face down, with his feet in the edge of the water. Their child was trying to coax him up. Deceased lived but few minutes, and never spoke nor became conscious after witness reached him. The bucket, about half or three-quarters full, was sitting on the ground near the spring, and the dipper lay near it. Deceased had no pistol on his person nor at his house at the time of his death. He went to the spring in his shirt sleeves, wearing no vest. During the difficulty in July, mentioned by the witness McGauhey, the defendant fired three shots into witness's room, deceased having fired one at him while he was whipping Bart Abbott.

George Brandt, a member of the jury of inquest, testified, for the State, that he examined the body of the deceased after the homicide, and found three wounds on it. One shot struck deceased on the point of the right shoulder, passed out at the top of the shoulder and pierced the neck just below the ear. Another shot struck the right arm, making a flesh wound. A third entered the small of the back at the waist of the pants, passed through the body and lodged under the skin about half an inch above the left nipple. John Earp and J. L. Pickering, members of the jury of inquest, corroborated Brandt, and stated, in addition, that they first saw the body at the spring, and that there was then no pistol on the body.

The State closed.

Melvin DeWitt was the first witness for the defense. He testified that he went to the the spring on the evening of August 16, 1886, to get a drink of water. While drinking, witness's horse left him and went up the path toward deceased's house. Witness followed and met deceased a short distance from the spring. Deceased changed his bucket from his right to his left hand, and thrust his right hand into his waistband as if to draw a pistol, but withdrew it without a pistol. As witness passed on the deceased turned and raised his hat and went on toward the spring. Witness then caught his horse and went on to Pruitt's house. Just before he got to Pruitt's he met the defendant with his gun. Defendant proposed to witness to go back to the spring to get a drink, but witness declined, saying that he had just had a drink. Defendant then went on to the spring, and within a short time witness heard ten or twelve shots fired in that direction. Defendant then came to the house, got on his horse and rode toward the spring until he came in sight of A.

W. Abbott, when he called to A. W. Abbott to "go down and attend to John; I don't want to hurt you." Witness and defendant then rode off together. Witness was in the deceased's store in July, 1886, when defendant and G. Bacchus came there. Bart Abbott ordered defendant to leave the store, and when defendant refused to do so called him a son of a bitch. Defendant then struck Bart several times with a chair. About the time that Bart took refuge behind the counter, the deceased thrust a gun through a half open door and fired upon defendant, the ball passing through the waistband of defendant's pants. Defendant fired two or three shots through the wall into the room from which deceased fired. About that time McGauhey said that the row must stop, and defendant left. As soon as defendant left on that day deceased remarked: "I did not get the son of a bitch, but I will kill him yet." Witness often heard deceased utter threats against the life of the defendant, all of which threats the witness communicated to the defendant prior to the homicide. The reputation of the deceased was that he was a violent, dangerous man, who was calculated to execute his threats. Witness was at the spring late on the fatal evening, and saw the body of the deceased. A Winchester rifle was lying near the body. A. W. Abbott was standing near the Winchester.

Cross examined, the witness said that it was about twenty steps from the spring where he met the deceased on the fatal evening. The deceased waved his hat before witness reached him. No other person that witness saw was then in sight. He saw nobody but deceased until he got to Pruitt's gate, when he met defendant. Witness was asked by the grand jury if he had any conversation with defendant when they met at Pruitt's gate, just before the homicide, and he replied in the negative, which was true. He was not asked then about defendant's proposition to go to the spring, and he said nothing about it. Defendant was in the habit of taking his gun everywhere he went. The witness never knew of the deceased having a row with any person other than the defendant.

W. L. Richards, Tom Loring and Lon Loring testified, for the defense, that they had heard the deceased repeatedly threaten to kill the defendant, and that they communicated those threats to the defendant before the homicide.

G. Bacchus, testifying for the defense, detailed the particulars of the difficulty of July, substantially as did the witness De-

Witt, and stated, in addition, that the purpose of the defendant in going to the house of deceased on the day of that difficulty, was to pay McGauhey for a pair of boots.

John Wesley testified, for the defense, that he was present in Judge Logan's office in Margaret, in October, 1886, and heard A. W. Abbott make a statement about the killing of deceased. He understood A. W. Abbott to say that he was standing in his brother's door when the first shot was fired by the defendant, and that, while standing in that door, he saw the deceased fall.

Two or more witnesses for the defense, testified, that it was well known to defendant, and to others, that deceased habitually carried a pistol, and the witness Norris, stated that some time prior to the homicide, deceased gave him a pistol to repair, and stated to him that he intended to kill defendant with it, and that, he, Norris, apprised defendant of such threat prior to the homicide.

*J. M. Standlee* and *Cockrell & Cockrell*, for the appellant: The court erred in refusing to charge the law applicable to murder in the second degree; the appellant reserved a special exception to this failure. The charge of the court must be measured by the evidence, and it is the duty of the court to instruct the jury on every legitimate deduction to be drawn from the evidence. Here the court charged only on murder of the first degree. This was error, if there was any evidence, however weak or inconsistent, however improbable, or however flimsy, that would tend to reduce the killing below that degree.

We shall attempt to show that there are several phases of the case demanding a charge on the second degree. The facts show that defendant and deceased were at deadly enmity; that deceased had repeatedly threatened to kill defendant; that they had two or more personal encounters, wherein deadly weapons were used; that the threats of deceased had been communicated to defendant; that the witness Gus (A. W.) Abbott, brother of the deceased, had also been engaged with deceased in one or more difficulties with defendant, in which deadly weapons were employed; that deceased was regarded as a violent and dangerous man, and calculated to execute his threats; that he habitually went armed, a fact known to defendant. There was but one witness who claimed to be an eye witness to the homicide (the said Gus Abbott), who claims to have arrived at the scene just as defendant fired the first shot. The defendant and de-

ceased met at a spring in the bed of the Wichita river, where they had equal rights to be. The evidence does not show with certainty that defendant knew deceased to be at the spring when he went there; it does show that deceased and his brother, Gus Abbott, were on the look out for some one (presumably the defendant). The meeting there was either accidental on the part of defendant, or it was premeditated. The evidence does not show which of these was the true theory. The declarations made by the defendant a few seconds before the homicide, and while on the way to the spring, were to the effect that he was going there after water.

It is quite consistent with the evidence to say that defendant did not know deceased to be at the spring, and that the meeting there was accidental. If the meeting was accidental, the killing under the circumstances was either the first degree or second degree of murder, or some lower degree of homicide, or justifiable; which of these was a question for the jury, under proper instructions from the court. If unexpectedly the defendant met his deadly enemy under such circumstances, and suddenly conceived in his mind, inflamed at the sight of him (however unwarranted his passion may have been), the design to kill him, the killing would be murder of the second degree. (Duebbe v. The State, 1 Texas Ct. App., 159; Hill v. The State, 5 Texas Ct. App., 2; Halbert v. The State, 3 Texas Ct. App., 656.) "The mere design, without lawful excuse or justification, however fully formed and firmly fixed in his mind," does not "constitute of itself express malice. For the design must originate in or result from a sedate, deliberate mind." (Primus v. The State, 2 Texas Ct. App., 376; Farrer v. The State, 42 Texas, 265.) The court doubtless concluded that, because the defendant was seen to arm himself with a gun immediately before starting to the spring, he knew of deceased's presence there, and went there with the deliberate design to kill him. But this was merely a circumstance tending to show that state of mind, and not conclusive proof of it; and the force of the fact as evidence of that design is largely destroyed when all the circumstances surrounding the parties are considered. Deceased lived in a few hundred feet of the spring, and, in view of the feeling between him and defendant, ordinary prudence would have required this precaution on the part of defendant; besides, it was shown that, since his difficulties with deceased, he habitually went armed. As he started he said, in effect, that he was going for a drink of water, and the facts and circum-

stances surrounding the transaction show that this may have
been true. If true, and the meeting with deceased was unex-
pected, the homicide may have been of any degree, dependent
on the other facts and circumstances in evidence. The court,
in effect, told the jury that it was not true that defendant was
going to the spring for the purpose he stated, but that that state-
ment was a mere pretext; that, in fact, knowing deceased to be
there, he had gone with the fixed purpose of murdering him.
We say that the refusal of the court to charge on anything but
murder in the first degree was to put the above construction on
the evidence. His deductions may have been correct; ours may
be correct. Who should determine? It is not the duty of the
court to draw conclusions of fact from, but to apply principles of
law to, the evidence. If any possible legitimate construction of
the evidence would reduce the killing to murder in the second
degree, it was the duty of the court to so charge. Or, if there
is a reasonable doubt on the point, it is for the jury and not for
the court to decide. "It is error to charge the jury that they
must either convict of murder in the first degree or acquit, if by
any possible legitimate construction of the evidence the jury
might have found the defendant guilty of murder in the second
degree." (Conner v. The State, 23 Texas Ct. App., 385.)

Again, if, from the conduct of the deceased and his brother,
Gus Abbott, taken together with the deadly enmity existing be-
tween them and defendant, it reasonably appeared to defendant
on the occasion of the homicide that deceased alone, or acting
with his brother, meant to challenge defendant to mutual com-
bat, and defendant, accepting such challenge, or what he be-
lieved a challenge, killed deceased—then such killing would not
be murder of the first degree. The deceased and his brother,
immediately before the killing, were talking together on the
brow of the hill leading to the spring, on the opposite side of
the creek from defendant; deceased proceeded towards the
spring, but stopped near the foot of the hill, and, turning
towards the house, whither his brother, Gus Abbott had gone,
"waved his hat." A very few moments later Gus Abbott re-
turns from the house with his gun, and, according to his testi-
mony, got to the brow of the hill just as defendant fired the first
shot at deceased. No witness saw the deceased in the interim,
while Gus Abbott was at the house. The evidence does not dis-
close whether defendant saw deceased and his brother meet and
have their conversation on the hillside or not, nor whether he

saw deceased waving his hat; if he did not see them there, doubtless he did not know deceased had gone to the spring, and the meeting there was unexpected to him, and the consequent killing less than murder in the first degree. If he did see them, then, under all the circumstances, he might have reasonably concluded that they were inviting him to a settlement of their difficulties, and especially when he sees Gus Abbott returning from his house with a gun, and in a run. This evidence not only called for a charge as to a killing in a mutual combat, but, as we shall presently see, for a killing in self defense; also for a charge on manslaughter. The killing, under the circumstances detailed, would, at most, have been only the second degree of murder.

Again, there is another phase of the case that demanded a charge of murder in the second degree. The defendant had threatened the life of the accused. Under all the circumstances, independently, for the present, of any overt act on the part of deceased showing an intention to execute his threats, was it permissible for the court to say in its charge that, as matter of law, those threats did not mitigate the offense? Should it not have been left to the jury to say whether or not the threats and previous conduct of deceased toward defendant repelled the idea of express malice? Threats of deceased against defendant, in cases of homicide, are admissible per se, independently of an attempt at their execution, to throw light upon the transaction, to show defendant's probable state of mind, to explain his acts. They may, according to circumstances, entirely justify; reduce murder to manslaughter, etc. (Johnson v. The State, 27 Texas, 757.) If they may reduce murder of the first degree to manslaughter under certain circumstances, why, we ask, may they not also reduce murder of the first degree to murder of the second degree? Murder of the first degree is when the killing is with malice aforethought, and unattended with circumstances that justify, excuse or mitigate. Murder of the second degree is when the killing is with malice, but when there are mitigating circumstances. The evidence was admissible and relevant; yet, in the opinion of the court below, it not only did not prove anything, but absolutely did not tend to prove anything. For, if it had, it was his duty to charge upon the phase of the case it did tend to prove, however slight its weight and tendency. (Hobbs v. The State, 16 Texas Ct. App., 517.) This is evidently the view the court below took of the evidence. We maintain that, under

the view of the case most unfavorable to defendant, the evidence of threats raised the issue of murder in the second degree—if, indeed, not manslaughter, independently of any act on part of deceased, when killed, to carry into execution such threats.    If there had been the overt act, then defendant would have been justified.    But at present we are arguing mitigation, and not justification.    This question is fully discussed by Justice White in Howard v. The State, 23 Texas Court of Appeals, 265. ·

The refusal of the court to charge on murder of the second degree seems to have been based on the idea that the act of defendant in arming himself with his gun immediately before starting to the spring, the place of the killing, showed his knowledge that deceased was there, and his intent to kill him. But, granted that defendant did know deceased was there, how did the court know his intent as matter of law?    Was not his intent a question of fact for the jury?    The taking of his gun was evidence of intent, not absolute proof.    Without proof of this intent showing express malice, there was no murder of the first degree.    The court virtually assumed the intent so proved. (See Howard v. The State, supra.)    The charge of the court, in effect, we submit, assumes the truth of facts sufficient to hang defendant:    That the meeting with deceased was premeditated, prearranged; that he brought about the meeting with the express purpose of killing the deceased.    We claim that the theories of the case that were favorable to defendant should also have had some consideration, and that there should have been less assumption of facts.

The court should have charged on manslaughter, applying to the evidence the principles of law when the homicide is committed in mutual combat, the defendant taking no undue advantage.    (King v. The State, 4 Texas Ct. App., 54; Lee v. The State, 21 Texas Ct. App., 243; Crist v. The State, Id., 363.)    Again, the defendant asked a special charge on manslaughter based on the theory of killing under terror or sudden resentment.    The statement of facts shows that the spring at which the homicide occurred was a public spring in the bed of the Wichita river, used by the public promiscuously.    This is sufficient to account for the presence of defendant and his right to be there.    We are justified in saying that the statement of facts will show that defendant had the right to go to the spring.    Penal Code, art. 594, which in terms says that the passion which would reduce killing from murder to manslaughter must not be "the result of

a former provocation," has been frequently construed by this court. • The purpose of the whole of chapter 14, Title 15, of the Penal Code, recognizing man's frailty and unaccountability when influenced by the uncontrollable emotions of the mind, is to reduce the grade of offense and the penalty, when the unlawful act is done in such state of mind. The actual condition of the mind at the time of the commission, rather than the causes that produced that condition, is the criterion as to the grade of the offense. We can only arrive at that condition by a consideration of all the circumstances affecting it, both present and antecedent. "In passing upon the sufficiency of the provocation, and the effects of the passion upon the mind of the defendant, the past conduct of deceased towards defendant, his threats and bearing, in fact all the facts and circumstances of the case should be considered by the jury. An act standing alone may not be sufficient provocation, but may be ample when it is one of a series of similar acts, or when it has been preceded by an insolent and aggravating course of conduct, whether similar or not to the act committed at the time of the homicide." (Miles v. The State, 18 Texas Ct. App., 156. See also the Georgia case there cited by Judge Hurt on the refusal to charge on both manslaughter and murder in the second degree.)

"If in a murder case there be evidence, which, however, inconclusively, tends to prove facts from which the jury may deduce a finding of manslaughter, it is incumbent upon the trial court to give the law of manslaughter in charge to the jury." (McLaughlin v. The State, 10 Texas Ct. App., 340. Special attention is also requested to Johnson v. The State, 22 Texas Ct. App., 225; Neyland v. The State, 13 Texas Ct. App., 549.) In this case what was the situation of the defendant at the time of the homicide? As he proceeds from Pruitt's house towards the spring, the spring is out of view until defendant reaches the bed of the river some thirty steps below the spring. He then, for the first time, so far as the evidence discloses, discovers the presence of deceased. From this point the shooting takes place, and from this point the defendant could see Gus Abbott, brother of deceased, making toward him at the brow of the hill on the opposite side, gun in hand. What the deceased was doing at and immediately before the firing of the first shot no witness saw, except that Gus Abbott says at the first shot he could see deceased from waist up and he appeared to be in a stooping posture. Whether defendant first saw Gus Abbott approaching

him with his gun, or the deceased at the spring, is not shown; in either event, defendant saw his two deadly enemies (one of whom, at least, had threatened to take his life, and the other of whom had actually attempted it), near him, one approaching him with a gun. The first shot defendant fired at deceased, the party nearest him, and from whom most danger was to be apprehended; the second shot was fired by Gus Abbott at defendant. Does this evidence under all the circumstances tend in any degree, however inconclusively, to show that the mind of defendant may have been so inflamed with sudden resentment or so affected with terror as to reduce the killing to manslaughter? If so, it was not for the court to withdraw from the jury the consideration of the evidence.

We further submit that the court erred in refusing to charge upon the several theories of self defense presented in the several special charges asked by counsel for defendant. Special exceptions were reserved to the charge on account of this omission. If defendant first became aware of the presence of deceased at the spring, when he reached the river bed, from which place he fired the fatal shot, then the sudden presence of deceased was, under all the circumstances, if coupled with the slightest demonstration or apparent demonstration, sufficient appearance of danger to justify defendant in acting. No eye other than defendant's saw the deceased just preceding the shot fired by defendant. Had deceased made a demonstration as if to draw a pistol, as he did a few moments before when suddenly startled by Melvin DeWitt as shown by the testimony of that witness? Did he in any manner manifest an intention to execute the threats he had made against the life of the defendant so often, and for which he had the witness Norris, the gunsmith, to put his weapon in order? Or from all the circumstances, present and antecedent, did it reasonably appear to defendant that deceased was about to execute such threats? The evidence is silent; and the defendant is presumed to be innocent until his guilt is established, and this presumption attaches to the evidence and the trial at every stage. Will facts then be presumed to aid the evidence in showing that defendant began the shooting without any real or apparent demonstration on the part of deceased?

The deceased generally carried a pistol, and this fact was known to defendant. What is apparent danger is to be judged of from the facts and circumstances of each particular case.

Had deceased been a boastful braggadocio and coward, and so known to defendant, to have met him thus would not have caused defendant to feel that his life was in danger; but quite different when he knows him to be a bad and dangerous man, not given to idle threats, a man who has already engaged in a deadly combat with him, and expressed an intention to follow it up until he has slain him. And the appearances of danger are to be judged of from all of the circumstances as they appeared to defendant, and not as they afterwards appeared to have been when it was discovered that in truth (if such was the fact), the deceased did not have the pistol defendant supposed him to have. (Spearman v. The State, 23 Texas Ct. App., 224; Conner v. The State, Id., 386; Brumley v. The State, 21 Texas Ct. App., 223; Patillo v. The State, 22 Texas Ct. App., 586; Penal Code, art. 574.)

We have thus far considered defendant's right of self defense apart from any connection Gus Abbott, the brother of deceased, may have had in creating the real or apparent danger that threatened the deceased. The evidence, as we insist, shows an acting in concert on the part of deceased and his brother, the witness, Gus Abbott, and the court should have submitted a charge, both on manslaughter and self defense, presenting this phase of the case. An apparent concert of action on their part would afford as much justification as would actual concert. It seems from the testimony of Gus Abbott that he and deceased knew of the presence of defendant at Pruitt's, and were on the look out for him. When Trumble started towards the spring, Gus Abbott got his gun, and went towards Trumble. In the mean time the deceased had, from the foot of the hill near the spring, waved his hat over his head while facing the house where Gus Abbott was. Defendant, however, is not shown to have known of the whereabouts of either of the Abbotts until he got to the bed of the river, from which point he could see the deceased at the spring and Gus Abbott on the brow of the hill. This relationship, their common enmity, and the fact that both had joined in a former difficulty against him, were sufficient alone, under the circumstances, to justify defendant in believing that they were acting together in a contemplated assault on him; and as a means of defense he was justified in beginning to shoot either of them, and continuing to shoot until out of all danger; and he was under no duty to retreat or cease his fight while either of his antagonists were in a position to do him harm. He

shot at both, alternately, it reasonably appearing to him that danger was to be apprehended from both. (Jones v. The State, 20 Texas Ct. App., 671; Cartwright v. The State, 16 Texas Ct. App., 487; McLaughlin v. The State, 10 Texas Ct. App., 359.)

We complain of the charge of the court on the subject of threats, and at the trial reserved a special exception. The defendant proved threats against his life by deceased, and that deceased was a violent and dangerous man, calculated to execute those threats; and proved further, as we insist, that under all the circumstances attending the homicide it reasonably appeared to defendant that deceased was about to execute his threats when killed. But whether this was or was not true is immaterial so far as concerns our present objection to the charge. The court charged the law on threats, as set forth in Penal Code, article 608, negatively, in effect, that the fact that deceased had threatened to take the life of defendant would afford no justification to defendant for the killing, unless the deceased at the time of the homicide, by some act then done, manifested an intention to execute the threats so made.

The charge of the court in every case is to be measured by and applied to the evidence. We do not complain that abstractly the above is not a correct legal proposition. Was it applicable to the evidence? If that principle was applicable to the evidence, the manner of its application is most radical error. The proposition is stated negatively, and the affirmative converse is nowhere hinted at. The law is, that if deceased had threatened to take the life of the accused, and if at the time of the homicide he manifested an intention to execute his threats, then accused would be justified in the killing, and the jury should find him not guilty. If proper to charge article 608, it should have been charged in such a way as to give defendant the benefit of the principle. "The rule applicable to all defenses, whether complete or otherwise, is that the court below must apply the law clearly, pertinently and affirmatively to the facts tending to support the defense." (Johnson v. The State, 43 Texas, 612; Moore v. The State, 15 Texas Ct. App., 2.) The jury are never told that they may acquit defendant if deceased did threaten, and if he did manifest an intention to execute his threats against defendant's life. If there were no facts, in the opinion of the court, tending to show that the deceased, at the time of the homicide, manifested an intention to execute his threats, why charge on the law of threats at all? The law of threats in that

event, as here applied, would have no more applicability to the case than the law of embezzlement. Is the court to be, then, permitted to convey to the jury the impression that, in the opinion of the court, all the evidence introduced by defendant on the subject of threats is a pretext for a defense and not a defense? Adopt the reasoning of Justice Hurt in McLaughlin v. The State, 10 Texas Ct. App., 357, and we may say: "The charge presenting the law of threats negatively, the impression is natural that, in the opinion of the judge presiding, the evidence fails to support this defense to the homicide. The effect of such a charge is to impress upon the minds of the jury that the presiding judge had but little if any confidence in the evidence tending to support the theory that deceased was killed while he was in the act of executing his threats against defendant. If the evidence made it necessary to charge upon threats, the law should have been given to the jury affirmatively, and not burdened—weighted down—with negatives." And we may add, if the law did not make it necessary to charge on threats, the court should not have gone out of the record to hunt up arguments, as it were, to show the jury that there was no theory of the case that would permit them to acquit the defendant; and in doing so the charge was virtually on the weight of the evidence. Threats are admissible in every case of this character. (Howard v. The State, 23 Texas Ct. App., 265.) The refusal of the court to charge on murder in the second degree, and this negative presentment of the law of threats, absolutely deprive defendant of the benefit of competent and relevant testimony, since it is in effect withdrawn from the consideration of the jury. Was it possible in any event for the court to say that, as matter of law, threats under the circumstances of this case did not mitigate to any extent the offense? Was it not for the jury to determine this?

We will call attention to the court's action in the admission of testimony in but one instance. We refer to the testimony of the witness McGauhey. It was error to allow proof that deceased was preparing to leave the county of his and defendant's residence for the purpose of avoiding difficulty with defendant, his preparations and intentions not being known to defendant. Unquestionably, we think, this would have been radical error, if the court had presented the question of self defense under apparent danger in the charge; and even if the charge, limited to murder in the first degree, was proper, we still think the admission of the testimony prejudicial to the rights of defendant, in-

asmuch as it was calculated to impress upon the jury that the deceased had abandoned all purpose to execute his threats against defendant, was seeking to avoid trouble with him, and for the sake of peace was even leaving his home. We say that the testimony as to his acts and what he was preparing to do was purely hearsay, irrespective of what he said. His acts could only be understood by the words accompanying them.

For instance, the witness could only know that deceased was preparing to leave home and go to Vernon to avoid trouble with defendant from something deceased or some one else said (hearsay). But more, the witness was first permitted to detail what deceased said he was going to do, and why. This of course was the veriest hearsay, and inadmissible for any purpose. The presiding judge withdrew from the consideration of the jury (so far as could be done by instructing them not to consider it) the testimony as to what deceased said of his intentions, but told them they could consider his acts tending to show that he was getting ready to leave. This was in effect to leave the incompetent testimony with the jury, and deprive the defendant of the benefit of his exception to it. This court has so often animadverted on the practice of trial courts in admitting incompetent testimony and afterwards attempting to withdraw it from the jury, that we do not consider it necessary to further refer to the matter, otherwise than to say that in this case by allowing the jury to consider the acts of deceased necessarily allowed them to also consider his words explaining those acts, and the district attorney in his closing argument was allowed to so argue as to give all the evidence, the "excluded" evidence and all, its full weight.

In conclusion we will say that the question before your honors is not whether the defendant is guilty or innocent; not of murder of the first or of the second degree, but it is as to whether the court charged the law and all the law applicable to the facts in proof—whether defendant has been legally convicted. We say that while the charge of the court may be abstractly correct as far as it goes, it does not go far enough; it does not instruct the jury how to apply the law to these facts. The charge would be equally as good in any other murder case as in this. It defines malice, express malice, murder, and tells the jury if defendant killed deceased with express malice that he is guilty of murder in the first degree. That is all. It would apply equally as well in a case of murder by poisoning or in an attempt at robbery.

It gives the statute. Is that all the law contemplates? Should not the charge instruct the jury how to apply the law to the very facts? We believe the charge is fairly subject to all the objections we have made to it, and that the defendant is entitled, however guilty he may be, to a trial under a charge of the court presenting every phase of the case raised by the evidence. To quote from McLaughlin v. The State, 10 Texas Court of Appeals, 359: "We are treating of the charge of the court, and not the guilt or innocence of the defendant. Every theory presented by evidence in the case demands of the court a charge thereon, whether strongly or weakly supported by the testimony. If there be evidence tending to support it, the law must be directly and pertinently applied thereto. The jury, and the jury alone, must pass upon the strength of the evidence which tends to support the theory. Nor can the evidence be so full and complete in favor of one theory as to preclude evidence or excuse the court in refusing or failing to charge the law relative to another theory."

We ask the court, with full confidence, that this case be sent back for a new hearing.

*W. L. Davidson,* Assistant Attorney General, for the State.

WILLSON, JUDGE. We have given this case a careful consideration in the light of the able brief and argument of counsel for the defendant. There is no doubt but that the legal propositions insisted upon by counsel for defendant are abstractly correct, but in our judgment none of them are applicable to the facts of this case. When we look to the evidence, there is but one reasonable conclusion that can be deduced from it, and that is that the homicide was an assassination, a deliberate killing actuated by malice express. There is no evidence even tending to show the existence of facts which would reduce the homicide to murder in the second degree or to manslaughter.

At the time the deceased was shot, he was stooping down, dipping water from a spring. He was unarmed and in his shirt sleeves. He had his child with him. Defendant was twenty-five yards distant from him, and his presence was evidently not known to the deceased. Such was the position and condition of the parties at the time the defendant commenced firing the fatal shots, as described by the only eye witness of the tragedy, and whose testimony is conclusively corroborated by the physical

facts and by circumstances testified to by other witnesses. As we view the evidence, it rebuts the theories of a sudden, unexpected meeting between the parties; of sudden passion on the part of the defendant; of self defense, so ingeniously presented by his counsel. There was no sudden meeting—no meeting at all, in fact, for defendant began firing upon deceased at a distance from him of twenty-five yards. There was no sudden passion excited in the mind of the defendant. His deliberate conduct at the time of and immediately after the shooting shows that he acted calmly, with a sedate mind and a formed design to kill. His aim was true and he continued firing until he knew that his victim had been mortally wounded.

There is certainly no evidence which tends to show that he acted in self defense. As to that part of the theory of self defense predicated upon the acts of the brother of deceased, the evidence very satisfactorily shows that defendant, at the time he opened fire upon the deceased, had not seen the brother of deceased, and did not know that he was in the immediate vicinity. As we understand the topography of the locality, he could not have seen deceased's brother until the latter reached the brow of the hill, and at that instant defendant was in the very act of shooting the deceased, and did shoot him before deceased's brother could fire upon defendant in defense of deceased.

We are of the opinion that the evidence neither demanded nor warranted instructions upon the law of murder in the second degree, manslaughter or self defense. We see no error in the charge as given to the jury. It enunciates the law of the case fully and clearly, and it would have been error to have supplemented it with the special instructions, or any of them, which were requested by the defendant.

With respect to the testimony of the witness McGauhey, we are of the opinion that no material error, if error at all, was committed. Defendant had proved that deceased had threatened to kill him, and he was seeking upon such threats to predicate self defense. It was competent for the State, we think, in rebuttal of such defensive theory, to prove that deceased was preparing to move away from that neighborhood, and to argue from such proof that if he had previously intended to kill the defendant he had abandoned such intention, and was seeking to get away from his vicinity. It tended to show, though remotely, that deceased, at the time he was killed, was making no effort

to carry such threat into execution. But, although this testimony may have been inadmissible, we can not perceive, in view of the other evidence in the case, how it could injuriously have affected the rights of the defendant, as there was no evidence raising the issue of self defense, or of any grade of homicide but that of murder in the first degree.

We have given attention to other errors complained of, but, considering the questions presented as unimportant, and as not involving any material error, if error at all, we deem it unnecessary to discuss them.

As the case is presented to us in the record, we think the conviction is legal, and we therefore affirm the judgment.

*Affirmed.*